No. 26-199

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

NATIONAL TPS ALLIANCE, et al.,
Appellees,

v.

KRISTI NOEM, et al.,
Appellants.

On Appeal from the United States District Court
for the Northern District of California
District Court Case No. 3:25-cv-05687-TLT

OPENING BRIEF FOR APPELLANTS

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*
Civil Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530
(202) 514-2000
Drew.C.Ensign@usdoj.gov

RUTH ANN MUELLER
*Senior Litigation Counsel*

RACHEL BERMAN-VAPORIS
JEFFREY M. HARTMAN
CATHERINE ROSS
ERIC SNYDERMAN
LAUREN BRYANT
DANIEL CAPPELLETTI
ILANA KRAMER
SHELBY WADE
*Trial Attorneys*

# **TABLE OF CONTENTS**

INTRODUCTION

JURISDICTIONAL STATEMENT ................................................................ 3

ISSUES PRESENTED .................................................................................. 3

STATEMENT OF THE CASE AND RELEVANT FACTS ........................ 3

    A.   The TPS Statute ................................................................................ 3

    B.   TPS Designation, Extension, and Termination of Honduras and
        Nicaragua Following a 1998 Hurricane ......................................... 5

    C.   TPS Designation, Extension, and Termination for Nepal Following
        a 2015 Earthquake .......................................................................... 6

    D.   The District Court Universally Postponed the Terminations,
        But This Court Stayed That Ruling Pending Appeal ..................... 8

    E.   The District Court Entered Partial Final Judgment On Plaintiffs'
        Administrative Procedure Act Challenges ..................................... 8

SUMMARY OF ARGUMENT ..................................................................... 9

STANDARD OF REVIEW ......................................................................... 10

ARGUMENT .............................................................................................. 11

    I.    THE DISTRICT COURT'S ORDER MUST BE REVERSED
        BECAUSE THE TPS STATUTE FORECLOSES JUDICIAL
        REVIEW ................................................................................... 11

        A.   The Review Bar Indisputably Shields the Challenged TPS
            Terminations From Judicial Review. .......................................... 11

        B.   The Rationale of *NTPSA I* and *NTPSA III* Forecloses
            Plaintiffs' APA Claims ................................................................ 20

i

C.  The District Court's Judgment is Irreconcilable with the
Statute.................................................................................................... 21

II.  THE DISTRICT COURT ERRONEOUSLY CONCLUDED
THAT THE TERMINATIONS WERE ARBITRARY
AND CAPRICIOUS. ....................................................................... 24

A.  The Secretary Properly Focused on Whether the Conditions
Underlying the TPS Designations Continued to Exist. ................................ 24

B.  The Secretary's Consideration of Country Conditions was
not Arbitrary and Capricious. .......................................................... 31

III.  THE CASE SHOULD BE REASSIGNED ON REMAND......................43

CONCLUSION ................................................................................. 49

BRIEF FORMAT CERTIFICATION

STATEMENT OF RELATED CASES

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES
## CASES

*Amgen Inc. v. Smith*,
   357 F.3d 103 (D.C. Cir. 2004) ........................................................ 16

*Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ........................................................................ 36

*Arthur Andersen LLP v. Carlisle*,
   556 U.S. 624 (2009) ........................................................................ 30

*Ascension Borgess Hosp. v. Becerra*,
   557 F. Supp. 3d 122 (D.D.C. 2021) ............................................... 16

*Baltimore Gas & Elec. Co. v. NRDC*,
   462 U.S. 87 (1983) .......................................................................... 34

*Bazua-Cota v. Gonzales*,
   466 F.3d 747 (9th Cir. 2006) ......................................................... 16

*Bd. of Governors v. MCorp Fin., Inc.*,
   502 U.S. 32 (1991) .......................................................................... 15

*Bouarfa v. Mayorkas*,
   604 U.S. 6 (2024) ............................................................................ 14

*California v. Azar,*
   950 F.3d 1067 (9th Cir. 2020) ....................................................... 32

*City of Arlington v. FCC*,
   569 U.S. 290 (2013) ........................................................................ 20

*Coventry Health Care of Mo., Inc. v. Nevils*,
   581 U.S. 87 (2017) .......................................................................... 13

*Ctr. for Biological Diversity v. Bernhardt*,
   946 F.3d 553 (9th Cir. 2019) ......................................................... 15

*Dan's City Used Cars, Inc. v. Pelkey,*
    569 U.S. 251, 260 (2013)……………………………………………..12

*DCH Reg'l Med. Ctr. v. Azar,*
    925 F.3d 503 (D.C. Cir. 2019) ................................................ 16

*Delgado v. Quarantillo,*
    643 F.3d 52 (2d Cir. 2011) ................................................ 16, 19

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019)................................................ 35, 36, 38, 39

*DHX Inc. v. Allianz AGF MAT, Ltd.,*
    425 F.3d 1169 (9th Cir. 2005)................................................ 10

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016)................................................ 29

*FCC v. Fox Television Stations, Inc,*
    556 U.S. 502 (2009)................................................29, 30, 31

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021)................................................37, 43

*FDA v. Wages & White Lion Invs., L.L.C.,*
    604 U.S. 542 (2025)................................................29, 30

*Garcia v. USCIS,*
    146 F.4th 743 (9th Cir. 2025) ................................................ 24

*Garland v. Ming Dai,*
    593 U.S. 357 (2021)................................................41, 43

*Gonzalez v. Herrera,*
    151 F.4th 1076 (9th Cir. 2025) ................................................ 23

*Guido v. Mt. Lemmon Fire Dist.,*
    859 F.3d 1168 (9th Cir. 2017)................................................ 30

*Harisiades v. Shaughnessy,*
    342 U.S. 580 (1952)................................................ 18

*Heckler v. Ringer*,
 466 U.S. 602 (1984).................................................................15, 18, 19

*Hekmati v. United States*,
 51 F.4th 1066 (Fed. Cir. 2022)....................................................... 13

*In re Ellis*,
 356 F.3d 1198 (9th Cir. 2004)................................... 43, 44, 46, 48

*Jennings v. Rodriguez*,
 538 U.S. 281 (2018).................................................................22, 27

*La. Forestry Ass'n Inc. v. Sec'y, U.S. Dep't of Labor*,
 745 F.3d 653 (3d Cir. 2014) ........................................................ 41

*Lamar, Archer & Cofrin, LLP v. Appling*,
 584 U.S. 709 (2018).................................................................12, 13

*Lands Council v. Powell*,
 395 F.3d 1019 (9th Cir. 2005) ..................................................... 36

*Lee v. U.S. Citizenship and Immigration Servs.*,
 592 F.3d 612 (4th Cir. 2010)........................................................16

*Liteky v. United States*,
 510 U.S. 540 (1994)...................................................................... 44

*Little Sisters of the Poor v. Pennsylvania*,
 591 U.S. 657 (2020).......................................... 28, 29, 30, 35

*McClellan Ecological Seepage Situation v. Perry*,
 47 F.3d 325 (9th Cir. 1995) ......................................................... 12

*McNary v. Haitian Refugee Center, Inc.*,
 498 U.S. 479 (1991).................................................................22, 23

*Morales v. Trans World Airlines, Inc.*,
 504 U.S. 374 (1992)...................................................................... 13

*Motor Vehicles Manufactures Ass'n v. State Farm,*
    463 U.S. 29 (1983) ............................................................31, 35

*Myers v. United States,*
    272 U.S. 52 (1926) ............................................................... 36

*National Archives & Records Admin. v. Favish,*
    541 U.S. 157 (2004) .............................................................. 42

*National TPS Alliance v. Noem,*
    150 F.4th 1000 (9th Cir. 2025) .................................... 18, passim

*National TPS Alliance v. Noem,*
    166 F.4th 739 (9th Cir. 2026) ...........................................20, 21

*National TPS Alliance v. Noem,*
    798 F. Supp. 3d 1008 (N.D. Cal. 2025) .................................. 8

*Nat'l Council of La Raza v. Cegavske,*
    800 F.3d 1032 (9th Cir. 2015) .....................................44, 45, 46

*Nat'l Sec. Archive v. CIA,*
    752 F.3d 460 (D.C. Cir. 2014) ............................................ 39

*Nat'l TPS Alliance v. Noem,*
    145 S. Ct. 2728 (2025) ........................................................ 38

*New Jersey v. Bessent,*
    149 F.4th 127 (2d Cir. 2025) ...........................................32, 33

*Nicholas v. United States,*
    633 F.2d 829 (9th Cir. 1980) ............................................... 15

*Organized Village of Kake v. USDA,*
    795 F.3d 956 (9th Cir. 2015) ............................................... 35

*Pacito v. Trump,*
    — F.4th —, 2026 WL 620449 (9th Cir. Mar. 5, 2026) ............... 46

*Painter v. Shalala,*
    97 F.3d 1351 (10th Cir. 1996) ............................................. 14

*Patel v. Garland,*
   596 U.S. 328 (2022) ................................................................ 11, passim

*Proyecto San Pablo v. INS,*
   189 F.3d 1130 (9th Cir. 1999) ........................................................ 19

*Ramos v. Wolf,*
   975 F.3d 872 (9th Cir. 2020), *vacated upon reh'g en banc,*
   59 F.4th 1010, 1011 (9th Cir. 2023) ............................................ 10, passim

*Reeb v. Thomas,*
   636 F.3d 1224 (9th Cir. 2011) ........................................................ 15

*Reno v. CSS,*
   509 U.S. 43 (1993) ........................................................................ 23

*River Runners for Wilderness v. Martin,*
   593 F.3d 1064 (9th Cir. 2010) ...............................................31, 34, 43

*Rotkiske v. Klemm,*
   589 U.S. 8 (2019) .......................................................................... 25

*San Luis & Delta-Mendota Water Authority v. Locke,*
   776 F.3d 971 (9th Cir. 2014) ...................................................... 11, passim

*Shaw v. Delta Air Lines, Inc.,*
   463 U.S. 85 (1983) ........................................................................ 13

*Sherley v. Sebelius,*
   689 F.3d 776 (D.C. Cir. 2012) ...................................................... 36

*Skagit Cnty. Pub. Hosp. Dist. No. 2 v. Shalala,*
   80 F.3d 379 (9th Cir. 1996) ......................................................14, 16

*Texas Alliance for Home Care Servs. v. Sebelius,*
   681 F.3d 402 (D.C. Cir. 2012) ...................................................... 19

*Truck Insur. Exch. v. Kaiser Gypsum Co., Inc.,*
   602 U.S. 268 (2024) ...................................................................... 30

*Trump v. Boyle,*
    145 S. Ct. 2653 (2025) ............................................................... 47

*Turtle Island Network v. U.S. Dep't Commerce,*
    878 F.3d 725 (9th Cir. 2017) ................................................. 10, 11

*U.S. Anesthesia Partners of Texas, P.A. v. U.S.P.H.S.,*
    126 F.4th 1057 (5th Cir. 2025) ................................................... 16

*United States v. Munsingwear,*
    340 U.S. 36 (1950) ...................................................................... 8

*United States* v. *Texas,*
    599 U.S. 670 (2023) .................................................................. 43

*United States v. Tohono O'odham Nation,*
    563 U.S. 307 (2011) .................................................................. 12

*United States v. Wells,*
    156 F.4th 907 (9th Cir. 2025) .................................................... 28

*Vermont Yankee v. NRDC,*
    435 U.S. 519 (1978) .............................................................. 29, 41

*Washington v. U.S. Dep't of State,*
    996 F.3d 552 (9th Cir. 2021) ...................................................... 15

*Yale New Haven Hosp. v. Becerra,*
    56 F.4th 9 (2d Cir. 2022) .......................................................... 16

## STATUTES

### The Immigration and Nationality Act of 1952, as amended:

8 U.S.C. § 1158(a) ........................................................................ 30

8 U.S.C. § 1160(e) ........................................................................ 22

8 U.S.C. § 1231(b)(3) .................................................................... 30

8 U.S.C. § 1254a(b)(1) .................................................................. 22

8 U.S.C. § 1254(b)(2)(A) ......................................................... 22

8 U.S.C. § 1254a(b)(1)(B) ......................................................... 4

8 U.S.C. § 1254a(b)(2) ......................................................... 4

8 U.S.C. § 1254a(b)(2)(B) ......................................................... 20

8 U.S.C. § 1254a(b)(3)(A) ......................................................... 4

8 U.S.C. § 1254a(b)(3)(B) ......................................................... 4, 20

8 U.S.C. § 1254a(b)(5)(A) ......................................................... 2, passim

8 U.S.C. § 1254a(d)(2)-(3) ......................................................... 20

8 U.S.C. § 1254a(i)(1)(C) ......................................................... 18

## OTHER STATUTES

5 U.S.C. § 706 ......................................................... 11, 36

5 U.S.C. § 706(2) ......................................................... 41, 43

5 U.S.C. § 8902(m)(1) ......................................................... 13

6 U.S.C. § 557 ......................................................... 4

26 U.S.C. § 7429(f) ......................................................... 15

28 U.S.C. § 1291 ......................................................... 3

28 U.S.C. § 1331 ......................................................... 3

28 U.S.C. § 1651(a) ......................................................... 44

28 U.S.C. § 2106 ......................................................... 44

28 U.S.C. § 3625 ......................................................... 15

34 U.S.C. § 20144(b)(3)(B) ......................................................... 13

42 U.S.C. § 1395w-3(b)(11) ................................................................ 19

42 U.S.C. § 9613(h) .......................................................................... 12

## RULES

Fed. R. App. P. 4(a)(1)(B) ................................................................. 3

Fed. R. Civ. P. 23(b)(2) ..................................................................... 8

## REGULATIONS

8 C.F.R. § 244.19 ............................................................................ 29

8 C.F.R. § 1208.16(c) ....................................................................... 30

## OTHER AUTHORITIES

H.R. Rep. No. 101-245 (1989) ......................................................... 17

# INTRODUCTION

The Secretary of Homeland Security (Secretary) has discretion to designate a foreign country for temporary protected status (TPS), giving eligible nationals from a designated country a reprieve from removal during the designation period. By statute, the Secretary must periodically review each designation and decide whether to extend or terminate it. TPS designations for Honduras, Nepal, and Nicaragua are at issue here.

All three countries were designated for TPS based on disruptions caused by long ago natural disasters. Honduras and Nicaragua were designated for TPS in 1999 based on a 1998 hurricane, and Nepal was designated in 2015 based on an earthquake that year. During her required periodic review of these designations, the Secretary found that each country had adequately recovered from the relevant natural disasters. Indeed, each country regularly accepts removals of its nationals. 3-ER-180. So, as the statute requires and as Secretaries have previously done numerous times, the Secretary terminated the designations.

Plaintiffs have never argued or presented evidence that the disaster-related conditions underlying these decades-old natural disasters had not substantially abated. Irrefutable country conditions evidence before the Secretary at the time of her decisions demonstrates that they had. Indeed, former Secretary of State Blinken recommended that the previous Secretary terminate Nepal's TPS designation. 5-ER-540-41.

Without any foothold in the facts, Plaintiffs raised two challenges under the Administrative Procedures Act (APA), asking the district court to set aside the

Secretary's TPS terminations because they were (in Plaintiffs' erroneous view) both "preordained" and not based on the consideration of "intervening country conditions" evidence in the designated countries. 1-ER-43-47. In granting partial final judgment for Plaintiffs on both grounds, the district court erred.

Most fundamentally, the district court disregarded the clear and unequivocal jurisdictional bar that Congress enacted in 8 U.S.C. § 1254a(b)(5)(A).[1] In no uncertain terms it provides that there is "no judicial review of any determination of the [Secretary] with respect to the … termination … of a foreign state" for TPS. § 1254a(b)(5)(A). This review bar forecloses Plaintiffs' APA claims.

Even if the Court reached the merits of Plaintiffs' APA claims, reversal would still be warranted. The Secretary complied with the statute, her decision to terminate these TPS terminations was appropriately grounded in her consideration of country conditions evidence, and her discretionary determination that the temporary conditions related to these bygone disasters no longer exist cannot be disturbed.

This Court has now—correctly—stayed the district court's decisions twice. The district court lacked jurisdiction to hear these claims at all, so this Court should simply reverse and remand with instructions to dismiss. But if this Court remands for further proceedings, the district court's injection of over-the-top rhetoric—which it highlighted

---

[1] Unless noted, all statutory citations in this brief refer to Title 8.

in its § 705 order and reiterated in a later order—and its manifest and repeated errors warrant reassignment to a different judge.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331, except to the extent that 8 U.S.C. § 1254a(b)(5)(A) eliminated jurisdiction to review the challenged TPS terminations for the reasons explained below. The Secretary timely appealed on January 8, 2026, within sixty days of the court's December 31, 2025 order. Fed. R. App. P. 4(a)(1)(B); 9-ER-1167-68. This Court has jurisdiction to review the court's partial final judgment under 28 U.S.C. § 1291.

## ISSUES PRESENTED

I.      Are TPS terminations reviewable under the APA, when Congress explicitly specified that any determination of the Secretary with respect to a TPS termination is not subject to judicial review?

II.     If the Court reaches the issue, should it reverse the district court's APA analysis, where the Secretary's TPS terminations were based on procedurally and substantively valid reasons and did not depart from any established agency policy?

III.    Should this case be reassigned on remand?

## STATEMENT OF THE CASE AND RELEVANT FACTS

### A.      The TPS Statute

The Immigration Act of 1990 established a program for providing temporary shelter in the United States on a discretionary basis for aliens from designated countries

3

experiencing ongoing armed conflict, environmental disaster, or "extraordinary and temporary conditions" that temporarily prevent aliens' safe return or, in the case of environmental disasters, temporarily render the country unable to adequately handle the return of its nationals. Pub. L. No. 101-649, 104 Stat. 4978.

As relevant here, the Secretary may, "after consultation with appropriate agencies of the Government," designate countries for TPS if she finds that:

(i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,

(ii) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and

(iii) the foreign state officially has requested designation under this subparagraph.

§ 1254a(b)(1)(B); *see* 6 U.S.C. § 557 (transferring TPS functions to the Secretary).

Initial TPS designations are discretionary and last "not less than 6 months and not more than 18 months." § 1254a(b)(2). At least 60 days before the end of the initial designation and any subsequent extension, the Secretary must "review the conditions in the foreign state … for which a designation is in effect" and "determine whether the conditions for such designation … continue to be met." § 1254a(b)(3)(A). If the foreign state "no longer continues to meet the conditions for designation," the Secretary "shall terminate the designation[.]" § 1254a(b)(3)(B).

4

Congress enacted a broad prohibition on judicial review of the Secretary's exercise of her TPS authority: "There is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." § 1254a(b)(5)(A).

## B. TPS Designation, Extension, and Termination of Honduras and Nicaragua Following a 1998 Hurricane

In 1999, Attorney General Reno designated Honduras and Nicaragua for TPS. In full, the rationale for the TPS designations was that "Hurricane Mitch swept through Central America causing severe flooding and associated damage in" Honduras and Nicaragua, and that "due to the environmental disaster and substantial disruption of living conditions caused by Hurricane Mitch," the countries were "unable, temporarily, to handle adequately the return of [their] nationals." 3-ER-350 (*Designation of Honduras Under [TPS]*, 64 Fed. Reg. 524 (Jan. 5, 1999)); 4-ER-530 (*Designation of Nicaragua Under [TPS]*, 64 Fed. Reg. 526 (Jan. 5, 1999)).

In 2017 and 2018, respectively, following thirteen intervening extensions, the Secretary terminated TPS for Nicaragua and Honduras because the conditions caused by Hurricane Mitch no longer existed. 3-ER-159; 4-ER-354. Litigation prevented implementation of those terminations, and, in 2023, Secretary Mayorkas rescinded the terminations and extended the designations. 3-ER-159; 4-ER-354.

On July 8, 2025, following the required review and consultation with appropriate agencies, Secretary Noem terminated TPS for both Honduras and Nicaragua, effective

September 8, 2025. 3-ER-158-61; 4-ER-354-56. Secretary of State Rubio had also recommended the termination of TPS for Honduras. 3-ER-163-64 (April 2025 letter).

Secretary Noem determined that conditions resulting from Hurricane Mitch "no longer cause a substantial, but temporary, disruption in living conditions in the area affected" and that Honduras and Nicaragua are "no longer unable, temporarily, to handle adequately the return of [their] nationals." 3-ER-160; 4-ER-355. In particular, among other things, the Secretary stated that Honduras "is now a popular tourism and real estate investment destination," cited reports indicating that most Hondurans have access to water, sanitation, and electricity, and determined that the Honduran government demonstrated "readiness to welcome back its nationals" including by "regularly accepting the return of its nationals with final removal orders over the last five years." 3-ER-160. Considering whether any putative reliance interests exist for those impacted by the termination decision, the Secretary observed that TPS designations are "time-limited" and that TPS notices "clearly notify aliens of the designations' expiration dates." 3-ER-161; 4-ER-356.

## C. TPS Designation, Extension, and Termination for Nepal Following a 2015 Earthquake

Nepal was designated for TPS when "a magnitude 7.8 earthquake struck Nepal" in April 2015, "resulting in a substantial, but temporary, disruption of living conditions in the area affected." 6-ER-848-49 (*Designation of Nepal for [TPS]*, 80 Fed. Reg. 36,346 (June 24, 2015)). Nepal was "unable, temporarily, to handle adequately the return of

6

aliens who are nationals of Nepal," and it "officially requested designation for TPS." 6-ER-848-49. After intervening extensions, the Secretary terminated Nepal's TPS designation when Nepal no longer met the conditions for the designation. 5-ER-536. In 2023, following litigation that prevented the termination from taking effect, then-Secretary Mayorkas rescinded the termination and extended the designation for 18 months until June 24, 2025. 5-ER-536.

On June 6, 2025, the Secretary terminated TPS for Nepal, effective August 5, 2025. 5-ER-556-38 (*Termination of the Designation of Nepal for [TPS]*, 90 Fed. Reg. 24,151 (June 6, 2025)). Former Secretary of State Blinken recommended TPS termination as well. 5-ER-540-41. Secretary Noem explained that, based on her review and consultation with appropriate agencies, Nepal has accomplished "substantial reconstruction from the earthquake's destruction such that there is no longer a disruption of living conditions," made "notable improvements in environmental disaster preparedness and response capacity," and is now "able to handle adequately the return of its nationals." 5-ER-536.

In particular, the Secretary cited reports that over 88% of damaged homes were rebuilt, over 90% of surveyed internally displaced persons had bought new homes, and over 81% of damaged health facilities were reconstructed. 5-ER-537. And Nepal has regularly accepted the return of its nationals with final removal orders over the last five years. 5-ER-537. Regarding reliance interests, the Secretary observed that TPS is "time-

7

limited" and TPS notices "clearly notify aliens of the designations' expiration dates." 5-ER-537.

**D.  The District Court Universally Postponed the Terminations, But This Court Stayed That Ruling Pending Appeal**

On July 7, the National TPS Alliance (NTPSA) and seven individual Plaintiffs challenged the terminations for Nepal, Honduras, and Nicaragua and moved to postpone the effective date of the Secretary's determinations.  On July 31, 2025, the district court granted Plaintiffs' motion.  *National TPS Alliance v. Noem*, 798 F. Supp. 3d 1008 (N.D. Cal. 2025).  The government filed an interlocutory appeal and secured a stay pending appeal.  ACMS No. 19, *Nat'l TPS Alliance v. Noem* (9th Cir. 25-4901).  Briefing in that interlocutory appeal was abated because the district court's order expired on November 18, 2025, and was not renewed.  The government subsequently moved to dismiss the district court's postponement order under *United States v. Munsingwear*, 340 U.S. 36 (1950).  ACMS No. 40, *National TPS Alliance v. Noem* (9th Cir. 25-4901).

**E.  The District Court Entered Partial Final Judgment On Plaintiffs' Administrative Procedure Act Challenges**

On December 31, 2025, after certifying classes under Fed. R. Civ. P. 23(b)(2) representing aliens from each designated country, the district court entered partial final judgment on Plaintiffs' APA claims and set aside the Secretary's TPS terminations for Honduras, Nicaragua, and Nepal.  1-ER-2-53.  The district court did not resolve Plaintiffs' constitutional claims.  1-ER-50-53.  This Court concluded that the

government was likely to prevail on appeal and was entitled to a stay of the partial final judgment pending appeal. ACMS No. 11.

## SUMMARY OF ARGUMENT

Congress granted the Secretary discretionary authority to afford *temporary* protection for aliens from countries adversely impacted by natural disasters which temporarily prevent them from adequately handling their nationals' return. Here, the Secretary made the unremarkable—and uncontestable—determination that after more than a quarter century, the conditions caused by a 1998 hurricane in Honduras and Nicaragua no longer exist, that the conditions caused by a 2015 earthquake in Nepal no longer exist, and that those disasters no longer prevented those countries from adequately handling the return of its citizens a decade later. Indeed, Secretary of State Blinken recommended the termination of Nepal's TPS designation in January 2025 for the same reasons that Secretary Noem subsequently articulated. 5-ER-540-41; *see also* 3-ER-163-64 (letter from Secretary Rubio recommending the termination of TPS for Honduras).

Dissatisfied with Secretary Noem's rational and well-reasoned TPS terminations, the district court flouted § 1254a(b)(5)(A)'s express bar on judicial review. That judgment is a blatant intrusion into the immigration powers of the political branches and the Secretary's unreviewable operation of the TPS statute. And it must be vacated.

Congress expressly barred judicial review of TPS determinations and "any" "determination" "with respect to" a termination. § 1254a(b)(5)(A). That prohibition

9

forecloses Plaintiffs' APA claims. Indeed, in *Ramos v. Wolf*, 975 F.3d 872, 892 (9th Cir. 2020), *vacated upon reh'g en banc*, 59 F.4th 1010, 1011 (9th Cir. 2023),[2] this Court previously held that Plaintiffs' second claim—that the Secretary was required to review intervening country conditions unrelated to an initial designation—was barred by § 1254a(b)(5)(A). The same conclusion is warranted here.

Even if Plaintiffs' APA claims were reviewable, the Secretary's decision making was reasonable and bears a rational relationship to the facts and law, so each of their claims fails on the merits. The Secretary was not required to consider intervening country conditions because her periodic review is focused on the conditions underlying the initial designation and, in all events, she thoroughly considered relevant country conditions and consulted with relevant agencies. Further, the Secretary was not required to explain why she did not also consider intervening country conditions, because her adherence to the statute did not amount to a policy change. Accordingly, the district court's judgment must be reversed.

## STANDARD OF REVIEW

This Court reviews "challenges to final agency action decided on summary judgment de novo and pursuant to Section 706 of the [APA]." *Turtle Island Network v.*

---

[2] Although non-precedential, *Ramos* "still carries informational and perhaps even persuasive precedential value." *DHX Inc. v. Allianz AGF MAT, Ltd.*, 425 F.3d 1169, 1176 (9th Cir. 2005) (Beezer, J., concurring). The Secretary cites *Ramos* in this brief for persuasiveness only.

*U.S. Dep't of Commerce*, 878 F.3d 725, 732 (9th Cir. 2017). Review of agency action under the APA is generally limited to the administrative record. *Id.* at 732; *see* 5 U.S.C. § 706. A "district court's decision to admit extra-record evidence" is reviewed "for abuse of discretion." *San Luis & Delta-Mendota Water Authority v. Locke*, 776 F.3d 971, 991 (9th Cir. 2014).

## ARGUMENT

## I. THE DISTRICT COURT'S ORDER MUST BE REVERSED BECAUSE THE TPS STATUTE FORECLOSES JUDICIAL REVIEW.

### A. The Review Bar Indisputably Shields the Challenged TPS Terminations From Judicial Review.

This Court should reverse the judgment because the TPS statute plainly forecloses judicial review of Plaintiffs' claims. The statute provides that "*[t]here is no judicial review of any determination* of the [Secretary] with respect to the designation, or *termination* or extension of a designation, of a foreign state" for TPS. § 1254a(b)(5)(A) (emphasis added). Plaintiffs seek judicial review of the Secretary's determinations with respect to termination of the TPS designations for three foreign countries. By barring "judicial review" of TPS terminations, § 1254a(b)(5)(A) clearly forecloses Plaintiffs' APA claims.

The plain meaning of the statute's broad terms confirms its broad sweep. *See Patel v. Garland*, 596 U.S. 328, 338-39 (2022) (examining the ordinary meaning of broadening terms in § 1252(a)(2)(B)(i)'s review bar). The term "determination" covers action by the Secretary regarding the designation of a foreign country for TPS. *See*

*Merriam-Webster's Dictionary* (2025) ("the act of deciding definitely and firmly"); *Black's Law Dictionary* 450 (6th ed. 1990) ("[t]o settle or decide by choice of alternatives or possibilities."); *Webster's New Collegiate Dictionary* 346 (1990) ("the act of deciding definitively and firmly"). The modifier "any," in the phrase "any determination," has a similarly expansive meaning encompassing "judgments of 'whatever kind.'" *Patel*, 596 U.S. at 338 ("As this Court has repeatedly explained, the word 'any' has an expansive meaning"); *see, e.g.*, *McClellan Ecological Seepage Situation v. Perry*, 47 F.3d 325, 328 (9th Cir. 1995) (holding that the "unqualified language" of 42 U.S.C. § 9613(h)'s prohibition on challenging environmental cleanups "precludes 'any challenges' to [covered] clean-ups, not just those brought under other provisions of the" same statute).

Cementing § 1254a(b)(5)(A)'s preclusive sweep, the phrase "with respect to" "has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018) ("[T]his Court has typically read the phrase 'relating to'—one of respecting's meanings—expansively."); *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) ("related to" means "having a connection with or reference to ... whether directly or indirectly"); *Webster's New Collegiate Dictionary* 1004 (defining "respect" as "a relation to or concern with something usually specified"). When Congress has stripped a court of jurisdiction "in respect to" certain claims, the Supreme Court has construed that as a "broad prohibition." *United States v. Tohono O'odham Nation*, 563 U.S. 307, 312 (2011).

12

For example, in holding that the Federal Employees Health Benefits Act preempted state health insurance law, the Supreme Court emphasized that "Congress's use of the expansive phrase 'relate to' shores up that understanding." *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 95-96 (2017) (discussing 5 U.S.C. § 8902(m)(1)). So too for airline deregulation. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84 (1992) ("The ordinary meaning of" "relating to" "is a broad one," requiring only that the two things have "some relation" or "connection" to one another."). The use of "relate to" similarly confirmed the preemptive effect of the Employee Retirement Income Security Act over state regulation. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97 (1983) ("A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan."). In each of those contexts, the Supreme Court reasoned that "relating to" or "respecting" broadened the scope of a preclusive statute, barring interference (by states or litigants) with the covered action. *See Lamar, Archer & Cofrin, LLP*, 584 U.S. at 717; *Coventry Health*, 581 U.S. at 95-96; *Morales*, 504 U.S. at 387-88; *Shaw*, 463 U.S. at 107-09.

That rationale applies with equal force to the TPS statute. By using the capacious phrase "with respect to," Congress broadened § 1254a(b)(5)(A)'s review bar to foreclose review of TPS terminations themselves *and* any action taken by the Secretary with "some relation" or "connection" to that determination. *Morales*, 504 U.S. at 383-84; *see, e.g.*, *Hekmati v. United States*, 51 F.4th 1066, 1069 (Fed. Cir. 2022) (exercise of Special Master's inherent reconsideration authority was unreviewable because Congress

13

provided that final decisions are "not subject to judicial review") (cleaned up; citing 34 U.S.C. § 20144(b)(3)(B)); *Painter v. Shalala*, 97 F.3d 1351, 1356 (10th Cir. 1996) ("We can think of little that Congress could have said to make the plain and unambiguous language of the statute, and its corresponding intent, more clear" where it specified "there shall be no administrative or judicial review under [a section] of this title or otherwise of the determination of [Medicare Act] conversion factors.") (altered).

Recent Supreme Court precedent enforcing materially similar jurisdiction-stripping language in the Immigration and Nationality Act (INA) confirms § 1254a(b)(5)(A)'s broad sweep. In *Patel*, the Supreme Court reasoned that § 1252(a)(2)(B)(i)'s bar on reviewing "any judgment regarding the granting of relief" covered "any authoritative decision" on the matter and was so expansive that it precluded judicial review of factual findings altogether. 596 U.S. at 337-40. Similarly, in *Bouarfa v. Mayorkas*, the Supreme Court unanimously underscored that the INA's limitations on judicial review provide "clear and convincing evidence of congressional intent to preclude judicial review," rendering reliance on the presumption that administrative action is ordinarily subject to judicial review inapplicable. 604 U.S. 6, 19 (2024).

This Court has enforced limitations on judicial review comparable to § 1254a(b)(5)(A) in other contexts and should do so here. For example, this Court rejected a procedural challenge to a decision that merely attempted to work around a limitation on judicial review. *Skagit Cnty. Pub. Hosp. Dist. No. 2 v. Shalala*, 80 F.3d 379,

386 (9th Cir. 1996) ("[I]f a procedure is challenged only in order to reverse the individual reclassification decision [shielded by a review bar], judicial review is not permitted."). It rejected both procedural and substantive challenges under a bar on APA review of "any determination, decision, or order" related to operation of certain prison programs. *Reeb v. Thomas*, 636 F.3d 1224, 1226-28 (9th Cir. 2011) (interpreting 28 U.S.C. § 3625). And it held that a bar on review of "[a]ny determination made by a district court under this section" foreclosed both "constitutional and evidentiary" review of certain tax assessments. *Nichols v. United States*, 633 F.2d 829, 830 (9th Cir. 1980) (interpreting 26 U.S.C. § 7429(f)). Those cases are not anomalies: Courts routinely find that similar statutory language bars judicial review, rebutting the presumption of judicial review and leaving it with no role to play. *See Bd. of Governors v. MCorp Fin., Inc.*, 502 U.S. 32, 42, 44 (1991); *Washington v. U.S. Dep't of State*, 996 F.3d 552, 560-64 (9th Cir. 2021); *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 563 (9th Cir. 2019).

At minimum, § 1254a(b)(5)(A) bars the arbitrary-and-capricious claims on which the district court granted judgment for Plaintiffs. 1-ER-40-44. Courts must look beyond a litigant's characterization of its claim to the relief sought to evaluate the applicability of jurisdictional bars. *Heckler v. Ringer*, 466 U.S. 602, 614 (1984) (rejecting "the Court of Appeals' separation of the particular claims here into 'substantive' and 'procedural' elements" and explained that "the inquiry in determining whether [the statute] bars federal-question jurisdiction must be whether the claim 'arises under' the Act, not whether it lends itself to a 'substantive' rather than a 'procedural' label."). That

is so because "'if a no-review provision shields particular types of administrative action, a court may not inquire whether a challenged agency decision is arbitrary, capricious, *or procedurally defective.*'" *Yale New Haven Hosp. v. Becerra*, 56 F.4th 9, 20 (2d Cir. 2022) (quoting *Amgen Inc. v. Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004)); *see Skagit Cnty.*, 80 F.3d at 386 (preclusion provision applies when "procedure is challenged only in order to reverse the individual [unreviewable] decision").

To hold otherwise "would eviscerate the statutory bar, for almost any challenge to [a determination] could be recast as a challenge to its underlying methodology." *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 505-507 (D.C. Cir. 2019); *see Yale New Haven Hosp.,* 56 F.4th at 18 (adopting the reasoning of *DCH Reg'l Med. Ctr.*, 925 F.3d at 506-07); *Ascension Borgess Hosp. v. Becerra*, 557 F. Supp. 3d 122, 130 (D.D.C. 2021), *aff'd*, 61 F.4th 999 (D.C. Cir. 2023) (a challenged action is unreviewable if it is inextricably intertwined with an action undisputedly shielded from review); *see also U.S. Anesthesia Partners of Texas, P.A. v. U.S.P.H.S.*, 126 F.4th 1057, 1064 n.2 (5th Cir. 2025).  To that end, this Court has not allowed litigants to "recast" arguments about the alleged failure to "properly weigh" evidence into putative collateral claims to secure review of otherwise jurisdictionally unreviewable relief.  *Bazua-Cota v. Gonzales*, 466 F.3d 747, 749 (9th Cir. 2006) (dismissing challenge to discretionary denial of adjustment of status); *see Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011) (per curiam) (preclusion provision barred review of a claim "indirectly challenging" underlying order); *Lee v. U.S. Citizenship and Immigration Servs.*, 592 F.3d 612, 620 (4th Cir. 2010) (holding that

alien could not evade judicial review bar by "carefully word[ing]" his complaint "to avoid expressly challenging the denial of his application" because his claim was that the agency made a faulty underlying determination, which "cannot be divorced from the denial itself").

The TPS review bar is no different. If § 1254a(b)(5)(A) did not bar Plaintiffs' APA claims, it would be rendered meaningless. This Court previously concluded that "the TPS statute precludes review of non-constitutional claims that fundamentally attack the Secretary's specific TPS determinations, as well as the substance of her discretionary analysis in reaching those determinations." *Ramos*, 975 F.3d at 892. That prohibition "precludes courts from inquiring into the underlying considerations and reasoning employed by the Secretary in reaching her country-specific TPS determinations." *Id.* at 891. Foreclosing judicial review conforms with a statutory scheme that "does not dictate any substantive guidelines or restrictions on the manner by which the Secretary may reach her TPS determinations" and does not "set forth or define the 'conditions in the foreign state' that the Secretary must consider … or how she should weigh these conditions." *Id.* at 891; § 1254a(b)(1), (b)(3).

As the statutory text indicates, Congress made a conscious decision to shield the Secretary's TPS determinations from judicial review. § 1254a(b)(5)(A); H.R. Rep. No. 101-245, at 14 (1989) ("Moreover, *none* of the [Secretary's] decisions with regard to granting, extending, or terminating TPS will be subject to judicial review.") (emphasis added). Specifically, Congress "explicitly carve[d] out from judicial review the

17

Secretary's decisions related to determinations with respect to the designation, or termination or extension of a country for TPS." *National TPS Alliance v. Noem*, 150 F.4th 1000, 1017 (9th Cir. 2025) (*NTPSA I*) (cleaned up). That approach is consistent with the longstanding recognition that immigration policy is "vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations" that are "exclusively entrusted to the political branches of government." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952).

That does not leave Plaintiffs without recourse. If Congress assesses that the Secretary's TPS authority is misapplied, her annual report containing "an explanation of the reasons" "why the designation was terminated or extended" provides Congress ample opportunity to use its oversight powers, strike a different balance, or provide for different immigration relief. § 1254a(i)(1)(C); *see, e.g.*, *The Impacts of Temporary Protected Status: Hearing Before the H. Comm. on Judiciary* (Dec. 17, 2025), *available at https://judiciary.house.gov/committee-activity/hearings/impacts-temporary-protected-status* (last accessed Mar. 25, 2025). But "[i]f the balance is to be struck anew, the decision must come from Congress and not from this Court." *Heckler*, 466 U.S. at 627.

In sum, every interpretive tool leads to the same conclusion: the expansive jurisdiction stripping language Congress employed in § 1254a(b)(5)(A) forecloses judicial review of these TPS terminations under the APA. Plaintiffs' challenges to the Secretary's "determination[s] … with respect to … the termination" of the Honduras, Nicaragua, and Nepal TPS designations therefore fail. § 1254a(b)(5)(A); 3-ER-158-61;

18

4-ER-354-56; 5-ER-556-58; *see Texas Alliance for Home Care Servs. v. Sebelius*, 681 F.3d 402, 409 (D.C. Cir. 2012) ("The mandate that there be '*no* administrative or judicial review' under the two cited statutes '*or otherwise*' unequivocally precludes review of the Secretary's actions addressing the seven aspects of the" bidding process established by statute) (emphasis original; citing 42 U.S.C. § 1395w-3(b)(11)).

Specifically, Plaintiffs' first APA claim—that the challenged TPS terminations were "preordained," 1-ER-40—constitutes a direct challenge to the determinations themselves and effectively seeks to supplant the Secretary's judgment with their own. *See, e.g., Heckler*, 466 U.S. at 614; *Proyecto San Pablo v. INS*, 189 F.3d 1130, 1141 (9th Cir. 1999) (the claim that a decision "was pretextual is no different from [an] argu[ment] that [the decision] was wrong"). And Plaintiffs' second APA claim—that the Secretary failed to adequately consult or consider intervening country conditions unrelated to these disaster-related TPS determinations, 1-ER-44-47—directly challenges the *substance* of the Secretary's TPS terminations, including her discretionary weighing of evidence, in a transparent effort to alter her ultimate TPS determinations. *See Heckler*, 466 U.S. at 614; *Ramos*, 975 F.3d at 891-92; *Delgado*, 643 F.3d at 55 (reasoning that indirect challenges are barred by a review bar). Because each of the challenged TPS terminations (and everything connected or related to them) is encompassed by the review bar, this Court should vacate the district court's judgment and remand with instructions to dismiss Plaintiffs' APA claims. § 1254a(b)(5)(A); *see Patel*, 596 U.S. at 337-40; *NTPSA I*, 150 F.4th at 1017; *see also Ramos*, 975 F.3d at 891-92.

By holding that the § 1254a(b)(5)(A)'s bar on judicial review nominally prevents judicial review of the Secretary's ultimate decision to terminate a country's TPS designation but allows litigants to seek reversal of that decision by challenging the evidence, analysis, and procedures underlying it, the district court effectively nullified the statute's broad prohibition on judicial review. Real-world litigants do not challenge agency determinations in a vacuum; they inevitably attack the evidence, analysis, and procedures underlying them. Under the district court's approach, those challenges may proceed, rendering Congress's sweeping bar on judicial review effectively meaningless.

## B.  The Rationale of *NTPSA I* and *NTPSA III* Forecloses Plaintiffs' APA Claims.

Although it declined to reach Plaintiffs' APA claims, this Court's recent decision in *National TPS Alliance v. Noem*, 166 F.4th 739, 757 n.8 (9th Cir. 2026) (*NTPSA III*),

*pet. for reh'g en banc filed* (Feb. 6, 2026), illustrates how Plaintiffs' APA claims are foreclosed by § 1254a(b)(5)(A)'s review bar.  *NTPSA III* reasoned that the review bar did not preclude judicial review of a "claim that the Secretary exceeded her statutory authority" by *reconsidering* and *vacating* a TPS extension.  *NTPSA III*, 166 F.4th at 757. That was so, the panel reasoned, because "the scope and 'extent of statutory authority granted to the Secretary is a first order question that is not a determination with respect to the designation, or termination or extension of a country for TPS.'" *NTPSA III*, 166 F.4th at 756 (altered; quoting *NTPSA I*, 150 F.4th at 1017); *but see City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (rejecting that analytic framework); *cf. Patel*, 596 U.S.

at 343 (rejecting argument that § 1252(a)(2)(B)(i) review bar allowed for review of "first-step decisions" underlying the ultimate determination). Plaintiffs cannot claim that the Secretary "exceeded her statutory authority" in terminating these TPS designations: Congress expressly authorized her to do so. *NTPSA III*, 166 F.4th at 757; *see* § 1254a(b)(2)(B), (b)(3)(B), (b)(5)(A), (d)(2)-(3). To the contrary, this Court emphasized that Congress "explicitly carve[d] our from judicial review the Secretary's decisions related to" TPS terminations, eliminating judicial review. *NTPSA I*, 150 F.4th at 1017; *see NTPSA III*, 166 F.4th at 765 n.13 ("[E]ven if the Secretary determines that a condition for designation continues to be met, an extension of TPS is discretionary."). Accordingly, because it is indisputable that the Secretary has statutory authority to terminate a TPS designation, § 1254a(b)(3)(B), there are no "first order" questions to review, and the rationale of *NTPSA I* and *NTPSA III* confirms that Plaintiffs' APA claims are barred by § 1254a(b)(5)(A). *See NTPSA III*, 166 F.4th at 748 ("The TPS statute grants the Secretary … significant discretion and authority in … terminating a country's TPS."); *NTPSA I*, 150 F.4th at 1017.

## C. The District Court's Judgment is Irreconcilable with the Statute.

The district court's interpretation of § 1254a(b)(5)(A) is erroneous and collapses under scrutiny. 1-ER-13-17. It concluded that the phrase "any determination" limits the review bar to "the single act of deciding whether the country conditions continue to be met for purposes of designating or terminating TPS." 1-ER-14. That is irreconcilable with § 1254a(b)(5)(A), which specifies what determinations the review

21

bar covers: *any* determinations—that is, determinations "of whatever kind," *Patel*, 596 U.S. at 338—*with respect to* TPS designations, extensions, and terminations. *NTPSA I*, 150 F.4th at 1017; *NTPSA III*, 166 F.4th at 748. The district court's textual alchemy failed to give any meaning to the broadening terms "any" and "with respect to," thereby violating the presumption that Congress does not "intend to make any portion of a statute superfluous" and that this Court must "give effect to every word of a statute wherever possible." *In Re Svenhard's Swedish Bakery*, 154 F.4th 1100, 1105 (9th Cir. 2025) (cleaned up); 1-ER-16-20. It also overlooked that the review bar extends to decisions, such as the effective date or duration of a TPS extension, §§ 1254a(b)(1), (b)(2)(A), or a national-interest finding, § 1254a(b)(1)(C), that do not necessarily turn on country conditions. Because the district court cannot "rewrite a statute as it pleases," its judgment must be reversed. *Jennings v. Rodriguez*, 538 U.S. 281, 298 (2018); 1-ER-13-17; *supra* Argument § I.A.

The plain text also distances this case from *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991), on which the district court relied. 1-ER-17. *McNary* considered a statute that barred judicial review "of a determination respecting an application for adjustment of status" under 8 U.S.C. § 1160(e). 498 U.S. at 491-92. Each plaintiff had unsuccessfully sought amnesty under Section 1160, but none "contest[ed] the denial of their … applications" for relief. *Id.* at 488; *see id.* at 487-88. Instead, the plaintiffs brought a "general collateral challenge[] to unconstitutional practices and policies used by the agency in processing applications." *Id.* at 492. The Supreme Court held that

such a challenge was reviewable, notwithstanding the statute's judicial review bar. Section 1160(e)'s "reference to 'a determination,'" the Supreme Court explained, "describes a single act"—there, the denial of a particular "application" for relief—and not broader "practice[s] or procedure[s] employed in making decisions." *Ibid*.; *see also Reno v. Catholic Soc. Servs.*, 509 U.S. 43, 64 (1993) (interpreting "the phrase 'a determination respecting an application for adjustment of status'").

Here, the "single act" contemplated by § 1254a(b)(5)(A) is the Secretary's determination with respect to whether to designate a country for TPS or to extend or terminate a particular country's TPS designation. Plaintiffs do not bring a "collateral" attack on any guidance document, regulation, or policy distinct from the Secretary's TPS determinations—instead, they attack the TPS terminations themselves. *See McNary*, 498 U.S. at 492. The "nature of respondents' requested relief" confirms the point. *Id.* at 484. Unlike *McNary*, Plaintiffs do not seek a declaration or order invalidating a collateral agency policy or practice. Rather, they seek an order barring implementation of these TPS terminations to prolong their temporary status. Under § 1254a(b)(5)(A), that type of direct attack on the Secretary's termination is unreviewable. The rationale of *McNary* thus supports the government, not Plaintiffs. *See Ramos*, 975 F.3d at 893 (concluding that APA challenge to the consideration of intervening country conditions was barred after analyzing *McNary*).

23

The district court's heavy reliance on the presumption in favor of judicial review and legislative history, 1-ER-18, simply underscores the infirmity of its analysis. The presumption and legislative history only apply if the statute is ambiguous. *Gonzalez v. Herrera*, 151 F.4th 1076, 1081 (9th Cir. 2025); *Garcia v. USCIS*, 146 F.4th 743, 754 (9th Cir. 2025). This statute is anything but: it unequivocally bars "judicial review" of "any determination" "with respect to" these TPS terminations, plainly seeking to foreclose judicial review and rebutting the review presumption. *Supra* Argument § I.A.

The district court's rationale provides no basis to disregard § 1254a(b)(5)(A)'s expansive bar on judicial review. Its judgment must be reversed with instructions to dismiss Plaintiffs' APA challenges.

## II. THE DISTRICT COURT ERRONEOUSLY CONCLUDED THAT THE TERMINATIONS WERE ARBITRARY AND CAPRICIOUS.

If the Court reaches the merits, it should reverse because none of the district court's bases for concluding that the Secretary's actions were arbitrary and capricious withstand scrutiny. 1-ER-39-49; *see* ACMS No. 11 at 4.

### A. The Secretary Properly Focused on Whether the Conditions Underlying the TPS Designations Continued to Exist.

The Secretary's periodic review of TPS designations does not require consideration of intervening events or country conditions unrelated to the basis of the initial designation, and the district court's contrary conclusion is erroneous and undercuts every aspect of its APA judgment. 1-ER-43-47; § 1254a(b)(3)(A).

The TPS statute permits a TPS designation "when nationals of that state cannot return there safely due to armed conflict, natural disaster, or other 'extraordinary *and temporary* conditions[.]'" *NTPSA I*, 150 F.4th at 1010 (quoting § 1254a(b)(1)(C) (emphasis added)). In considering whether to extend a TPS designation, the statute requires the Secretary to "determine whether the conditions *for such designation* under this subsection *continue* to be met." § 1254a(b)(3)(A) (emphasis added). Notably, Congress required the Secretary to terminate a TPS designation if she "determines under subparagraph (A) that a foreign state (or such foreign state) no longer continues to meet *the conditions for designation under paragraph (1).*" § 1254a(b)(3)(B) (emphasis added). Thus, the statute unambiguously requires the Secretary to evaluate whether a country designated for TPS *continues* to meet the criteria for *designation*.

The statute makes triply clear what "designation" means by making it a separate subsection entitled "Designations" and delineating the three exclusive grounds for TPS designations. § 1254a(b)(1)(A)-(C); *see also* § 1254a(g) (making TPS the "exclusive authority" for the Secretary to permit aliens to "remain in the United States temporarily because of their particular nationality"). Congress brought the point home by specifying that a country could be designated for TPS "only if" § 1254a(b)(1)(B)'s criteria were met.

Nowhere did Congress require the Secretary to consider any other factors in whether to extend or terminate a TPS designation. § 1254a; *see Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) ("It is a fundamental principle of statutory interpretation that 'absent

provisions cannot be supplied by the courts.'") (cleaned up; quoting A. Scalia & B. Garner, Reading Law: the Interpretation of Legal Texts 94 (2012)). To the contrary, this Court previously ruled that "[n]othing in the language of the TPS statute requires the Secretary to consider intervening events prior to terminating TPS, or to explain her failure to do so." *Ramos*, 975 F.3d at 893; *see* § 1254a(b)(3)(A).

The operation of the TPS statute across administrations confirms the point. Certain countries have previously been subject to *multiple*, simultaneous designations to account for subsequent events that satisfy the statutory requirements for a TPS designation. *NTPSA I*, 150 F.4th at 1011-12 (discussing the 2023 *redesignation* of Venezuela for TPS); § 1254a(b)(1)(B). Conversely, prior administrations have terminated TPS because the conditions leading to the original designation no longer satisfied the statute's criteria—precisely the standard the district court concluded Secretary Noem incorrectly applied here. *Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination of Guinea's Designation for Temporary Protected Status*, 81 Fed. Reg. 66,064, 66,065-66 (Sept. 26, 2016) (noting that "[w]hile the impacts of the [Ebola] epidemic pose a lasting challenge to Guinea's economy and the capacity of its health system to provide treatment for preventable or treatable conditions," "the extraordinary and temporary conditions that prompted Guinea's TPS designation have substantially resolved and no longer prevent nationals of Guinea from returning to Guinea in safety"); *Termination of the Designation of Burundi for Temporary Protected Status*, 72 Fed. Reg. 61,172, 61,173 (Oct. 29, 2007) ("[C]onditions that warranted the initial

designation of TPS [for Burundi] in 1997 and the re-designation in 1999 no longer continue to be met."); 1-ER-45-47.

Further, TPS designations have repeatedly been terminated despite ongoing problems in the designated countries analogous to the district court's concerns here. *See, e.g.*, *Termination of Designation of Angola Under the Temporary Protected Status Program*, 68 Fed. Reg. 3,896, 3,896 (Jan. 27, 2003) (terminating Angola's TPS designation despite the remaining "challenge of assisting an estimated 4 million displaced Angolan nationals[,]" ongoing "concern that Angola lacks housing, medical services, water systems, and other basic services destroyed by a 27-year-long war[,]" and "as many as 8 million landmines planted in Angolan soil"); *Termination of the Province of Kosovo in the Republic of Serbia in the State of the Federal Republic of Yugoslavia (Serbia-Montenegro) Under the Temporary Protected Status Program*, 65 Fed. Reg. 33,356, 33,356 (May 23, 2000) (terminating Kosovo's TPS designation because "[a]lthough conditions remain difficult with bursts of ethnically-motivated violence, the situation in Kosovo cannot now be classified as 'ongoing internal conflict'").

In short, a plain and contextual reading of the text shows that the proper focus of the Secretary's periodic review of TPS designations to determine if they should be extended or terminated is on whether the conditions that led to the TPS designation "continue," and not whether new, unrelated conditions have arisen. § 1254a(b)(3)(A); *see Jennings*, 583 U.S. at 286 (emphasizing that courts must interpret statutes "not rewrite it"). None of the district court's contrary rationale withstands scrutiny.

27

The district court's *ipse dixit* conclusion that the Secretary is required to consider *all* country conditions in a country following a TPS designation, and related conclusion that the term "such designation" is ambiguous, are belied by the plain language of the statute. 1-ER-44-47; *see Pulsifer*, 601 U.S. at 133-44; *United States v. Wells*, 156 F.4th 907, 912 (9th Cir. 2025) ("Interpretation of a word or phrase depends upon reading the whole statutory text[.]"). Specifically, its reliance on a "broader TPS designation" has no textual foundation and fails to recognize that if subsequent events in a foreign country satisfy the statutory requirements for a TPS designation, that would be grounds for a new *designation* in the exercise of the Secretary's discretion; it would not require an extension of a prior designation. § 1254a(b)(1)(A)-(C); 1-ER-46. And its conclusion that the statute requires no link between the natural disaster underlying a TPS designation and the ability of a foreign country to handle its nationals' return, 1-ER-46, overlooks § 1254a(b)(1)(B)(i)-(iii)'s actual criteria for TPS designations and the statue's use of the additive conjunction "and" between those criteria.

In effect, the district court invented an atextual fourth criterion for consideration in the periodic review process—whether there are reasons of *any* sort that would prevent the return of the country's nationals—rendering multiple provisions of the statute superfluous and violating the foundational principle that a court may not impose additional judge-made requirements on agencies that Congress has not prescribed and the Constitution does not compel. *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 677 (2020) (courts may not "add[] terms not found in the statute"); *see In Re Svenhard's*

28

*Swedish Bakery*, 154 F.4th at 1105; 1-ER-44-47. Because the district court's interpretation of § 1254a(b)(3)(A) ignored that principle and "impose[d] limits on [the] agency's discretion that are not supported by the text," its judgment must be reversed. *Little Sisters of the Poor*, 591 U.S. at 677; *see Vermont Yankee v. NRDC*, 435 U.S. 519, 524 (1978); 1-ER-43-47.

The district court's rationale cannot be sustained under the change-in-position doctrine either. 1-ER-47. This doctrine, assuming it applies to all informal guidance or practices, generally requires an agency to acknowledge and explain a departure from a prior established agency position. *See, e.g., FDA v. Wages & White Lion Invs., L.L.C.,* 604 U.S. 542, 570-71 (2025) (guidance); *Encino Motorcars, LLC v. Navarro,* 579 U.S. 211, 222 (2016) (regulation); *FCC v. Fox Television Stations, Inc*, 556 U.S. 502, 517 (2009) (enforcement policy). But it does not apply here because there is no regulation, official guidance, or policy demanding consideration of intervening events or country conditions evidence unrelated to the basis of an initial TPS designation. *See Fox*, 556 U.S. at 515 (explaining that the agency cannot "simply disregard rules that are still on the books"); 8 C.F.R. § 244.19 (TPS termination regulation). Nor has DHS made any "hard-and-fast commitment" to consider evidence beyond what Congress required, *Wages*, 604 U.S. at 573, as, again, DHS has terminated designations because the conditions leading to them no longer satisfied the TPS statute's criteria, *supra* at 26. *See* 1-ER-44-48 (failing to identify any prior policy). It is not arbitrary or capricious for the Secretary to conduct the discretionary (and unreviewable) case-by-case analysis that

Congress articulated in § 1254a(b)(3)(A), as Secretaries across administrations have done for decades to determine whether a foreign country should remain designated for TPS. *See Wages*, 604 U.S. at 572 (rejecting challenge to FDA's consideration of scientific evidence because the statute and FDA's own guidance left it with "broad discretion"); *Fox*, 556 U.S. at 520-21 (rejecting challenge to FCC's ban of only some expletives in light of its "context-based system" to consider content on a "case-by-case basis").

Finally, the district court's emphasis on the "humanitarian purpose of the TPS statute" overlooks that Congress intended TPS to afford *temporary* protection for *particular* reasons existing in the *foreign country* and not as a panacea of permanent humanitarian protection for TPS beneficiaries. *See* §§ 1158(a), 1231(b)(3); 8 C.F.R. § 1208.16(c) (mechanisms for aliens to seek asylum and related protection); 1-ER-45. Likewise, the district court's reliance on legislative history and policy concerns "cannot 'surmount the plain language of the statute.'" *Truck Insur. Exch. v. Kaiser Gypsum Co., Inc.*, 602 U.S. 268, 284 (2024) (quoting *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 629 (2009)); 1-ER-44.

In sum, the district court disregarded the statute's plain meaning and stepped into Congress's shoes by imposing an extra-textual new requirement. *Little Sisters of the Poor*, 591 U.S. at 677; *see* § 1254a(b)(3)(A); *Guido v. Mt. Lemmon Fire Dist.*, 859 F.3d 1168, 1175 (9th Cir. 2017) (explaining that "it is not [the Court's] role to choose what [it] think[s] is the best policy outcome and to override the plain meaning of a statute").

This Court should correct that error (which infected the district court's entire APA analysis, 1-ER-42-43) and reverse.

### B. The Secretary's Consideration of Country Conditions was not Arbitrary and Capricious.

Nor were the terminations arbitrary and capricious. "The arbitrary and capricious standard is a deferential standard of review under which the agency's action carries a presumption of regularity." *Locke*, 776 F.3d at 994. Under that narrow and deferential standard, a "court is not to substitute its judgment for that of the agency." *Fox*, 556 U.S. at 513-14 (citations omitted); *see Motor Vehicles Manufactures Ass'n v. State Farm,* 463 U.S. 29, 43 (1993).

Consistent with the statute, Secretary Noem considered conditions in Nepal, Honduras, and Nicaragua, § 1254a(b)(1)(B), and ultimately determined that termination of TPS for each country was warranted. 5-ER-535-38 (Nepal); 4-ER-354-56 (Nicaragua); 3-ER-158-61 (Honduras). These notices show that the Secretary, after consultation with appropriate government agencies, properly addressed and considered the statutory considerations in doing so. *See River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (upholding decision "founded on a rational connection [to] the facts"). Those considerations are whether (1) an earthquake, flood, or other environmental disaster resulted in "a substantial, but temporary, disruption of living conditions in the area affected"; (2) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state; and (3) the

foreign state has requested a TPS designation. § 1254a(b)(1)(B)(i)-(iii); *see California v. Azar*, 950 F.3d 1067, 1096 (9th Cir. 2020) (en banc) (the agency need only show that it "examined the relevant considerations and articulated a satisfactory explanation for its action"); *see also New Jersey v. Bessent*, 149 F.4th 127, 152 (2d Cir. 2025) (agency need only have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made") (internal quotation omitted).

With respect to Nepal, the Secretary concluded that terminating the designation was appropriate, a decade after the earthquake that prompted it, because the Nepali government reported that "88.36% of damaged households have been rebuilt" and had "disbanded" its reconstruction authority after "most impacted structures were rebuilt." 5-ER-537. The Secretary additionally considered "improvements to [Nepal's] preparedness and response capacity," "disaster-resilient housing, infrastructure, and community systems," "economic growth" and increase of "purchasing power of lower income households," as well as the Nepali government's demonstrated capacity to accept aliens with final removal orders over the past five years. *Id.* The Secretary's determination was based on her consultation with appropriate governmental agencies and review of country conditions evidence. *See e.g.*, 5-ER-542-48 (State Department Recommendation), 549-61(USCIS memorandum), 659-68 (Nepali Times Article), 676-80 (Disaster Displacement, Nepal Country Briefing). It was also consistent with former

32

Secretary of State Blinken's January 2025 recommendation that Nepal's TPS designation be terminated in light of its reconstruction progress. 5-ER-540-41.

As for Nicaragua, the Secretary terminated its TPS designation because "notable improvements allow Nicaragua to adequately handle the return of its nationals." 4-ER-355. The Secretary recognized that Hurricane Mitch in 1998 was "a sudden catastrophe that caused severe flooding and associated damage" but that the hurricane was no longer disrupting living conditions or preventing Nicaragua from accepting the return of its nationals a quarter-century later. *Id.* Specifically, Nicaragua had improved its roads, school infrastructure, and access to healthcare; built a stable economy; and regularly accepted the return of its nationals over the preceding five years. *Id.* This determination was again based on the Secretary's consultation with appropriate government agencies and review of country conditions evidence. *See, e.g.,* 4-ER-357-69 (Department of State Recommendation), 373-90 (USCIS Memorandum), 457-75 (Congressional Research Service Report).

Finally, the Secretary concluded that "the conditions supporting Honduras'" 1999 designation for TPS were no longer met because the "conditions resulting from Hurricane Mitch no longer cause a substantial, but temporary, disruption in living conditions" such that Honduras is "temporarily" unable to "adequately" handle the return of its nationals. 3-ER-160. Specifically, over the intervening 26 years since Hurricane Mitch, the vast majority of Hondurans gained access to water, sanitation, and electricity and that, with international assistance, "Honduras has strengthened its

disaster management capacity at the municipal and national levels[.]" *Id.* Further, given Honduras's demonstrated acceptance of its nationals with final removal orders, the Secretary concluded the government could accept the return of its nationals. *Id.* And, once again, the Secretary's determination was based on her consultation with appropriate government agencies and review of country conditions evidence. *See, e.g.,* 3-ER-165-79 (USCIS memorandum), 180 (ICE Memorandum), 190-215 (Congressional Research Service Report). Indeed, Secretary Rubio recommended that Honduras's TPS designated be terminated. 3-ER-163-64.

As demonstrated, the Secretary's determinations are "within the bounds of reasoned decisionmaking," *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 104, 104-05 (1983), and they satisfy APA review. After all, under the APA, "[t]he agency's action … need only be a reasonable, not the best or most reasonable, decision." *River Runners for Wilderness,* 593 F.3d at 1070 (citation omitted). Common sense compels the same conclusion: concluding that *temporary* protection based on a natural disaster was no longer warranted a decade—or even *quarter century*—after it occurred is eminently reasonable. The district court's contrary judgment must be reversed because it was based on invented requirements and its own impermissible decision to substitute "its own judgment [about] the appropriate outcome." *Locke,* 776 F.3d at 994 (citation omitted).

To begin, the district court's conclusion that the Secretary's TPS terminations were "preordained," despite satisfying the unreviewable statutory factors, is not a

cognizable basis for relief under the APA. 1-ER-39-43. Agency decisions are not vulnerable to arbitrary-and-capricious invalidation solely because they are guided by administration policy priorities. Just the opposite: An agency is not required to have an "open-minded attitude" in considering an action, and so long as an action complies with "the APA's objective criteria," courts may not "rebuke[]" an agency for any "purported attitudinal deficiencies." *Little Sisters of the Poor*, 591 U.S. at 685. The law is clear that "a court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019); *Organized Village of Kake v. USDA*, 795 F.3d 956, 968 (9th Cir. 2015) (agency may reevaluate the weight given to factors following election). Instead, "[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs." *State Farm*, 463 U.S. at 59 (Rehnquist, J., concurring in part). After all, "[i]t is expected—perhaps even critical to the functioning of government—for executive officials to conform their decisions to the administration's policies," *Ramos*, 975 F.3d at 897-98, especially for determinations regarding foreign country conditions and a country's ability to handle adequately the return of its nationals infused with sensitive judgment calls implicating foreign policy.

That a new administration may pursue different policy priorities is a feature of our constitutional structure, not a basis for invalidating agency decision-making. The

President's power necessarily encompasses "general administrative control of those executing the laws," throughout the Executive Branch of government, of which he is the head. *Myers v. United States*, 272 U.S. 52, 164 (1926)). And, contrary to the district court's rationale, it is not unlawful to "implement the President's policy directives to the extent permitted by law." *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012); 1-ER-40 (citing E.O. 14159). Thus, the district court's erroneous conclusion must be reversed. 1-ER-40-41.

The district court also abused its discretion in admitting extra-record evidence to second-guess the wisdom of the Secretary's TPS determinations. 1-ER-41; Dkt. 193 at 3; *see Locke*, 776 F.3d at 991. This Court follows a "general rule that courts reviewing an agency decision are limited to the administrative record," and while the Court has identified "limited" exceptions, it has stressed that such exceptions "are narrowly construed and applied." *Lands Council v. Powell*, 395 F.3d 1019, 1029-30 (9th Cir. 2005); 5 U.S.C. § 706 (directing review of "the whole record"). This rule recognizes that "the recognition that further judicial inquiry into 'executive motivation' represents 'a substantial intrusion' into the workings of another branch of Government and should normally be avoided." *Dep't of Com.*, 588 U.S. at 781 (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977)). Thus, the "party seeking to admit extra-record evidence initially bears the burden of demonstrating that a relevant exception applies." *Locke*, 776 F.3d at 992.

36

The district court reasoned that extra-record evidence was necessary because of "bad faith" and "to identify and plug holes in the administrative record which might reveal whether the agency has considered all relevant factors and has explained its decision truthfully," and that Plaintiffs' list of thirty-six exhibits served that purpose. Dkt. 193 at 3. But the "bad faith" finding was predicated on the district court's *stayed* order on interim relief. Dkt. 97 at 3. Moreover, review of the extra-record documents underlying the district court's judgment merely confirms that it abused its discretion and used that extra-record evidence to "substitute its own policy judgment for that of the agency" and not to fill any gap in the administrative record. *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *Locke*, 776 F.3d at 991; 1-ER-41.

Critically, none of the evidence (and extra-record evidence) the district court relied upon comes close to establishing that these TPS terminations were "preordained," as the quoted statements have no direct relationship to the challenged TPS terminations and nearly all of them were remote in time. 1-ER-41. For example, a statement made by then-Governor Noem at her confirmation hearing—months before these challenged TPS terminations—that the TPS statute was "abused and manipulated by the Biden administration" merely shows, at most, an intent to adhere to the purpose of TPS as a *temporary* protection. 7-ER-878. Similarly, Secretary Noem's January 29, 2025, statement that she would follow the President's directive to ensure that "those who come in [to the United States] under a program, under a visa, and are

37

here in this country, that they're following the rules of that program" shows the Secretary's adherence to the law. 1-ER-972.

The relied-upon campaign statements by then-candidates Trump and Vance are even more remote to the challenged TPS terminations of Nepal, Nicaragua, and Honduras. 7-ER-956-58 (October 2024 NewsNation interview with President Trump discussing TPS for Haiti); 7-ER-962 (October 2024 statement from Vice President candidate J.D. Vance that "What Donald Trump has proposed doing is we're going to stop doing mass parole. We're going to stop doing mass grants of Temporary Protected Status."). None of the cited statements come close to establishing that the TPS terminations for Nepal, Honduras, and Nicaragua were preordained.

The district court's reliance on E.O. 14,169, *Protecting the American People Against Invasion* (Jan. 20, 2025), is equally misplaced because the President merely directed the Secretary to ensure "that designations of [TPS] are consistent with the provision of [§ 1254a] and that such designations are appropriately limited in scope and made only so long as may be necessary to fulfill the textual requirements of that statute." 1-ER-41. A directive from the President to follow the law does not (and cannot) render every subsequent decision under that statute arbitrary and capricious. *See Dep't of Com.*, 588 U.S. at 781. Nor does a DHS press release discussing the Supreme Court's order in *Nat'l TPS Alliance v. Noem*, 145 S. Ct. 2728 (2025), permitting the Secretary's termination of TPS for Venezuela to take effect, establish that these TPS terminations were preordained. 7-ER-987.

38

Likewise, a February 2025 DHS press release discussing a TPS determination for *Haiti* has no bearing on the TPS terminations at issue. 1-ER-41 (quoting 7-ER-967). The district court's amalgamation of statements that do not even mention the countries at issue here simply cannot establish that the termination of these years-and-decades old TPS designations was arbitrary or capricious. 1-ER-41; *see Dep't of Com.*, 588 U.S. at 781 (agency action to implement their policy preferences does not render that action arbitrary and capricious). Any other conclusion would lead to the untenable conclusion that the Secretary is powerless to exercise authority under the TPS statute, including in terminating decades-old designations that can no longer be considered "temporary," and that self-interested aliens have more control over the immigration policy of the United States than the Senate-confirmed Secretary.

None of the district court's other rationales for concluding that these TPS determinations were "preordained" withstand scrutiny.

The preparation of decision memos for the Secretary by her staff, before her ultimate TPS determinations, is not unusual and does not render her TPS terminations arbitrary or capricious either. *See Dep't of Com.*, 588 U.S. at 781 (political, foreign relations, and national security concerns routinely inform agency policymaking); 1-ER-41. The TPS statute is designed to *automatically* extend in the absence of a determination "whether the conditions for such designation … continue to be met" at least 60 days before the end of the prior extension. § 1254a(b)(3)(A). In contrast, the Secretary must provide written notice announcing a TPS termination. § 1254a(b)(3)(B).

39

There is nothing arbitrary and capricious or procedurally irregular about the Secretary's staff preparing pre-decisional drafts of decision memos for the Secretary's ultimate consideration—indeed, such work product is usually *encouraged* as part of the reasoned decision process by protecting pre-decisional drafts from disclosure to promote "the candid and frank exchange of ideas in the agency's decisionmaking process." *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014). The district court's concern that the Secretary's staff prepared pre-decision drafts before receiving the entire record the Secretary would ultimately rely upon ignores that these drafts were *pre-decisional*. 1-ER-41. Indeed, email exchanges show that her staff expected the Secretary to review additional country conditions evidence before making a final decision. 7-ER-1024; 7-ER-1026. Staff also noted where updated country conditions may have less impact because recent country conditions evidence was already available. 7-ER-1036 (April 2025 email observing "we don't have an updated [Department of State] report [for Nepal], but the report DOS sent in January under the prior administration recommended termination"). That was eminently reasonable: there is no dispute that each administrative record contained country conditions evidence relevant to evaluating whether "the conditions for [each] designation … continue to be met," particularly where the relevant disasters occurred years or decades ago. § 1254a(b)(3)(A); *see* 3-ER-158-352, 4-ER-354-97, 5-ER-535-61; *see, e.g.*, 5-ER-540-48 (Secretary Blinken's 2024 recommendation that TPS for Nepal be terminated). And, tellingly, the district court never identified any country conditions traceable to the 1998 hurricane affecting

Nicaragua and Honduras, or the 2015 earthquake affecting Nepal, that the Secretary overlooked. 1-ER-39-43; *see* 5 U.S.C. § 706(2) ("due account shall be taken of the rule of prejudicial error.").

The district court's conclusion that the Secretary relied on "skewed data" flows entirely from the erroneous premise that intervening circumstances unrelated to the initial designation must be considered, which as explained, is a conclusion unmoored from the text that must be reversed. Argument § II.A; 1-ER-41. Again, courts cannot impose "additional judge-made procedural requirements on agencies that Congress has not prescribed and the Constitution does not compel." *Garland v. Ming Dai*, 593 U.S. 357, 365 (2021).

Relatedly, there is no requirement that the Secretary consult with the Secretary of State in particular, and the district court does not explain why that consultation with other agencies that routinely address foreign country conditions was insufficient. § 1254a(b)(3)(A) (requiring only "consultation with appropriate agencies of the Government"); 1-ER-41. In this context, "consultation" means "asking the advice or opinion of someone." Black's Law Dictionary (12th ed. 2024); *see* § 1254a(b)(3)(A). The statute thus affords the Secretary considerable latitude in satisfying that requirement in the exercise of her discretionary authority. *See Vermont Yankee*, 435 U.S. at 524 (agencies are generally free to develop their own procedures); *see, e.g.*, *La. Forestry Ass'n Inc. v. Sec'y, U.S. Dep't of Labor*, 745 F.3d 653, 670-71 (3d Cir. 2014) (stating that when Congress grants an agency broad discretion in conducting certain activities, it

affords discretion to the agency in consulting with outside entities so long as there is a "reasonable connection" between the outside agency's findings and the final agency decision). Here, Secretary Noem complied with the TPS procedural requirements by reviewing country conditions evidence before terminating TPS for Nepal, Honduras, and Nicaragua and consulted with appropriate agencies, including the State Department. *See Ramos*, 975 F.3d at 891 ("The TPS statute also does not dictate any substantive guidelines or restrictions on the manner by which the Secretary may reach her TPS determinations"); 3-ER-165-79 (USCIS Memorandum regarding country conditions in Honduras); 4-ER-358-72 (State Department Recommendation and Letter from Secretary of State Blinken regarding Nicaragua), 4-ER-373-90 (USCIS Memorandum regarding country conditions in Nicaragua), 5-ER-542-48 (State Department Recommendation Regarding Temporary Protected Status for Nepal); 5-ER-549-61 (USCIS Memorandum on country conditions in Nepal). Thus, the district court's conclusion that such consultation is unsupported by the record and contradicts the "presumption of legitimacy" of agency action. *National Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004); 1-ER-41, 43.

Ultimately, the district court's judgment is based on its misapprehension of fundamental administrative law principles. Even putting § 1254a(b)(5)(A) aside, the Secretary's TPS terminations easily withstand deferential APA review because her determinations—that the temporary conditions stemming from years-and-decades old natural disasters in Nepal, Nicaragua, and Honduras no longer existed or prevented the

safe return of their nationals—were "founded on a rational connection [to] the facts." *See River Runners for Wilderness*, 593 F.3d at 1070; 5-ER-535-38 (Nepal); 4-ER-354-56 (Nicaragua); 3-ER-158-61 (Honduras). Indeed, it remains uncontested that the conditions (a 1998 Hurricane and 2015 earthquake) underlying these TPS designations no longer exist. *See, e.g.*, 5-ER-688-771 (September 2024 report on reconstruction and resilience in Nepal). By attempting to ignore that reality, the district court committed additional errors by inventing a-textual procedural requirements to align with its policy preferences, *see Ming Dai*, 593 U.S. at 365, and by supplanting the Secretary's discretionary decision-making through its tenuous conclusion that these TPS terminations were "preordained" based on extra-record statements having nothing to do with *these* determinations. *See Prometheus Radio Project*, 592 U.S. at 423. All told, even if review was available—it is not, *see* § 1254a(b)(5)(A)—the district court's conclusion that the Secretary's TPS terminations were arbitrary and capricious must be reversed.[3]

## III. THE CASE SHOULD BE REASSIGNED ON REMAND

Finally, this Court should reassign the case if it remands for proceedings other than dismissal. This Court has authority to reassign a case to a different trial judge in "unusual circumstances," where "the original judge would reasonably be expected upon

---

[3] The district court also erred in granting universal relief under 5 U.S.C. 706(2) instead of tailoring the relief to the named parties. *See, e.g.*, *United States* v. *Texas*, 599 U.S. 670, 695-699 (2023) (Gorsuch, J., concurring in the judgment). Although circuit precedent allows for that remedy, the government reserves the right to challenge its lawfulness on further review.

remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected" or where "reassignment is advisable to preserve the appearance of justice." *In re Ellis*, 356 F.3d 1198, 1211 (9th Cir. 2004) (en banc); 28 U.S.C. §§ 1651(a), 2106. Either problem suffices for reassignment, *Ellis*, 356 F.3d at 1211, and both are present here.

*First*, this case should be reassigned because the district court's decisions have relied on extreme rhetoric suggested by neither party, outside the record, and with no bearing on this case. *See Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1046 (9th Cir. 2015) (reassigning when judge's views were "both well-established and inappropriately strong"). The court opined—in the first line of its § 705 order—that the TPS terminations told Plaintiffs "to atone for their race, leave because of their names, and purify their blood." ECF No. 73 at 1. The court further wrote that it "shares" Plaintiffs' "concerns" and refuses to "shut its eyes to the country's shifting attitudes toward immigrants." ECF No. 73 at 17-18. The court situated removal of illegal aliens as the moral equivalent of the horrors of "the transatlantic slave trade" in America's "long history of transporting individuals against their will," opining that "America has seen this pattern before" because "[m]any freed slaves were sent to countries to which they had no connection whatsoever" and some states "passed laws demanding freed slaves to leave." ECF No. 73 at 18 n.1.

No party suggested that comparison. The district court's analogy to the slave trade was purely one of its own invention—and included extensive citations for that purpose that were the apparent product of the district court's original research (and certainly were not supplied by Plaintiffs). *See generally Liteky v. United States*, 510 U.S. 540, 554-55 (1994) (explaining that a district court's reliance on an "extrajudicial source" may be relevant to a bias analysis). The court next compared the challenged terminations to the Chinese Exclusion Act, 1-ER-15, opining that "Plaintiffs here face similar tides." ECF No. 73 at 18 n.2. The court also compared these disaster-related TPS terminations to the internment of Japanese Americans during World War II. 1-ER-16. No party suggested those comparisons, either. And the court said that it could not "ignor[e]" the "Secretary's animus against immigrants and the TPS program." ECF No. 73 at 28; 1-ER-15 (reasoning that the government's argument "raise[d] notable comparisons to arguments that were once made, but are not rejected today.").

A judge is unlikely to be able to set aside publicly announced views that a policy is racist, asks aliens to "atone for their race" or "purify" their putatively impure blood, or is akin to the horrors of the transatlantic slave trade. *See Cegavske*, 800 F.3d at 1046. Nor were these views that the district court injected into this case mere one-offs, but instead were central to the district court's reasoning. *See* 1-ER-15-16. The district court reiterated those comparisons to the slave trade and Chinese Exclusion Act in denying a stay pending appeal, spending pages of the opinion block-quoting the § 705 opinion's judicially injected analogy to the slave trade. Dkt. 87 at 3-5. Those pages reemphasized

that the court "did not forget that this country has bartered with human lives" in the slave trade and refused to "shut its eyes" to her perception of the country's "attitudes toward immigrants." *Id.* A "reasonable observer" could hardly fail to "conclude" that the court's views "are both well-established and inappropriately strong," which renders reassignment is appropriate. *Cegavske*, 800 F.3d at 1046. Indeed, the district court has continued to maintain those views. *See* 1-ER-15-16 (identifying "notable comparisons" between challenged action and Chinese Exclusion Act and Japanese internment during World War II).

*Second*, reassignment is also warranted to preserve the appearance of justice. *Ellis*, 356 F.3d at 1211. After entering preliminary relief, the district court continued to proceed consistent with its already-expressed "strong views" on the issues in this case, and a reasonable person aware of its prior opinion would question its ability to "put out of [her] mind" the conclusions it previously drew. *Id.*; *compare Pacito v. Trump*, — F.4th —, 2026 WL 620449, *30 (9th Cir. Mar. 5, 2026) (Lee, J., dissenting in part) (cautioning against "the temptation of judicial resistance: District courts cannot stand athwart, yelling 'stop' just because they genuinely believe they are the last refuge against policies that they deem to be deeply unwise. Otherwise, we risk inching toward an imperial judiciary that lords over the President and Congress."), *with* 1-ER-52 (opining that it is "the duty of every public servant entrusted with shaping a more just society to bring those truths into the open, to translate lived experience into written protection."). At the § 705 hearing, the district court admonished government counsel "to think about

the oath that each of you took as you became lawyers and what it is that you're defending … today[.]" ECF No. 88 at 6. But this Court held that the very same merits arguments that the government was making—which the district court implied were somehow incompatible with oaths as bar members—were *likely to prevail* on appeal. ACMS No. 19, *National TPS Alliance v. Noem*, No. 25-4901 (9th Cir.). Suggesting that there was any impropriety in advancing *meritorious* arguments is injudicious.

The district court even permitted an amicus brief for the plaintiffs but rejected one for the government because it would not find the latter brief "helpful." ECF No. 73 at 6, 93. Such disparate treatment for amicus briefs underscores the appearance of bias here and how entrenched the district court's views are—contrary views were categorically excluded from consideration as unhelpful, while supportive views were readily welcomed.

Moreover, the district court has repeatedly ignored precedent. It disregarded *CASA* based on her incorrect view that it was decided with "limited briefing and no argument." Dkt. 60 at 1; 2-ER-82-83. It disregarded *Trump v. Boyle*'s admonition that the Supreme Court's emergency rulings "squarely control[]" in "like cases." 145 S. Ct. 2653, 2654 (2025); ECF No. 73 at 34-35. It also ignored this Court's decision to stay its § 705 order, instead referring to it as a mere "interruption[]." 1-ER-2. But this Court's order fairly demanded more respect than the casual dismissal it received.

Indeed, even though Court had unanimously stayed the district court's § 705 stay—and the district court could fairly expect its final judgment would too be stayed

(as it was, again unanimously), ACMS No. 11—the district court remarkably refused to even expedite briefing on whether to stay its judgment. ECF No. 200. Nor did the district court act quickly once the stay motion was fully briefed. Instead, the court ultimately denied the government's motion for a stay pending appeal as moot after this Court again stepped in to stay its decision. ECF No. 215.

Accordingly, to "preserve the appearance of justice," *Ellis*, 356 F.3d at 1211, this Court should reassign this case on remand.

## CONCLUSION

This Court should reverse the district court's judgment that the termination of

TPS for Honduras, Nicaragua, and Nepal were unlawful and remand with instructions

to dismiss all of Plaintiffs' APA claims for lack of jurisdiction.

Respectfully submitted,

BRETT A. SHUMATE
    *Assistant Attorney General*

YAAKOV M. ROTH
    *Principal Deputy Assistant Attorney General*

/s/ Drew C. Ensign
DREW C. ENSIGN
    *Deputy Assistant Attorney General*
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530
(202) 514-2000
*Drew.C.Ensign@usdoj.gov*

RUTH ANN MUELLER
    *Senior Litigation Counsel*

JEFFREY HARTMAN
RACHEL BERMAN-VAPORIS
ERIC SNYDERMAN
LAUREN BRYANT
CATHERINE ROSS
LORI MACKENZIE
DANIEL CAPPELLETTI
ILANA KRAMER
SHELBY WADE
    *Trial Attorney*

## **BRIEF FORMAT CERTIFICATION**

Pursuant to Federal Rule of Appellate Procedure 32(g)(1) and Ninth

Circuit Rule 32-1(a), (f), I certify that Respondent's Brief:

(1) was prepared using 14-point Garamond type;

(2) is proportionally spaced; and,

(3) contains 11,767 words, exclusive of tables of contents and

authorities, and certificates of counsel.

/s/ Drew C. Ensign
DREW C. ENSIGN
*Deputy Assistant Attorney General*

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Ninth Circuit Rule 28-2.6(b), I certify that the following cases raise the same or related challenges to the Secretary's administration of the TPS statute:

- *National TPS Alliance, et al.*, *v. Kristi Noem, et al.*, 773 F. Supp. 3d 807 (N.D. Cal. Mar. 31, 2025), *affirmed* 150 F.4th 1000 (9th Cir. 2025). The Supreme Court stayed the district court's § 705 order. *NTPSA v. Noem*, 145 S. Ct. 2728 (2025).

- *National TPS Alliance, et al.*, *v. Kristi Noem, et al.*, 798 F.Supp.3d 1108 (N.D. Cal. 2025), *aff'd by National TPS Alliance v. Noem*, 166 F.4th 739 (9th Cir. 2026), *petition for reh'g en banc filed* No. 25-5724 (9th Cir. Feb. 6, 2026). The Supreme Court stayed the district court's judgment. *NTPSA v. Noem*, 146 S. Ct. 23 (2025).

- *Haitian Evangelical Clergy Association et al. v. Donald J. Trump, et al.*, 789 F. Supp. 3d 255 (E.D.N.Y. July 1, 2025) (final judgment addressing Haiti's partial TPS vacatur), *appeal filed* (2d Cir. Sept. 25, 2025).

- *CASA Inc., et al.*, *v. Kristi Noem, et al.*, 792 F. Supp. 3d 576 (D. Md. 2025), *denial of stay affirmed by* 2025 WL 2028397 (4th Cir. July 21, 2025).

- *Haitian Americans United, Inc., et al. v. Donald J. Trump, et al.*, 1:25-cv-10498 (D. Mass.) (addressing Haiti and Venezuela TPS determinations).

- *Doe v. Noem*, 25-cv-8686 (S.D.N.Y. Nov. 19, 2026) (interim relief order addressing Syria's TPS termination), *appeal pending* No. 25, 2995 (2d Cir.). The Supreme Court is considering the government's application for stay and petition for certiorari before judgment. *Noem v. Doe*, No. 25A952 (U.S. Feb. 26, 2026).

- *Miot v. Trump*, 25-cv-2471, — F. Supp. 3d —, 2026 WL 266413 (D.D.C. Feb. 2, 2026) (interim relief order addressing Haiti's TPS termination), *appeal pending* No. 26-505 (D.C. Cir.).

- *African Communities Together v. Noem*, 25-cv-13939, — F. Supp. 3d —, 2026 WL 395732 (D. Mass Feb. 12, 2026) (interim relief order addressing South Sudan's TPS termination).

- *Doe v. Noem*, 25-cv-15483 (N.D. Ill. Jan. 23, 2026) (interim relief order addressing Burma's TPS termination), *appeal pending* No. 26-1294 (7th Cir.).

- *African Communities Together v. Noem*, 26-cv-10278 (D. Mass. Jan. 22, 2026) (interim relief order addressing Ethiopia's TPS termination).

/s/ Drew C. Ensign
DREW C. ENSIGN
*Deputy Assistant Attorney General*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 10, 2026, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the ACMS system. All parties were served electronically through the ACMS system.

<u>/s/ Drew C. Ensign</u>
DREW C. ENSIGN
*Deputy Assistant Attorney General*